**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,　　　　　CASE NO.  1:07cr52

　　　　　Plaintiff,　　　　　　　　　　　　JUDGE MICHAEL R. BARRETT

　-vs-

TRACY WASHINGTON,

　　　　　Defendant.

## ORDER

This matter came on for hearing based upon Defendant, Tracy Washington's motion to suppress (Doc.  14) all physical evidence seized and all statements made by Mr. Washington to law enforcement.  The government filed a response (Doc. 23).  Post hearing briefs were also submitted by each party (Doc. 28 and 29).   Jeff Moore and Officer Hasselbrock testified at the hearing.  Officer Rock's deposition transcript is Trial Exhibit 4.

Defendant contends that the search and arrest violated his Fourth Amendment and *Miranda* rights.  All of the parties concede that the evidence was not seized pursuant to a search warrant, however, the government maintains that the law enforcement officers had consent to search the apartment and that Washington was a trespasser in the apartment so that no reasonable expectation of privacy existed.

I.　　FACTS

On December 18, 2006, Cincinnati Police Officer Brendon Rock arrested George Young in the hallway of Young's apartment building located at 1906 Elm Street.  Young rented an apartment, Unit 3, from Jaymor Properties, which is owned by Jeff Moore.  As


Mr. Young was being escorted outside, he engaged in a conversation with his nephew, Defendant Tracy Washington, who was leaning outside of a window from Mr. Young's apartment. Mr. Young "told him that he wanted everyone out of the apartment." (Rock Depo., p28).

Both prior to and subsequent to Mr. Young's arrest, Jeff Moore had complained to the Cincinnati Police about illegal activity taking place at 1906 Elm Street, specifically in Apartment 3. Mr. Moore had received complaints from tenants that individuals with guns were going into Apartment 3. Mr. Moore had requested that the Cincinnati Police check the building and remove any individuals who did not belong there.

On December 25, 2006 Officer Rock and his partner Officer Eric Weyda were on routine patrol in the vicinity of 1906 Elm Street. At approximately 5:00am, Officers Rock and Weyda observed two female individuals in a verbal altercation outside of 1906 Elm Street. The Officers stopped to investigate. During the course of this investigation, one of the female individuals, later learned to be Ellen Wilson, indicated that she was Mr. Young's girlfriend and that she was staying in Apartment 3. Officer Rock "knew from speaking to both Mr. Young and Mr. Moore that no one was permitted to be in the apartment." (Rock Depo., p11). He then asked Ms. Wilson to sign a consent to search and let them into the apartment. She obliged. Ms. Wilson indicated her address on the consent form as "2584 WW North Blvd/1906 Elm St. #3". Officer Rock testified that "even though I believed she had no legal right to be there, I figured if she was willing to sign it, why not cover all my bases." (Id.).

The Officers and Ms. Wilson then proceeded to Apartment 3 wherein she knocked on the door and announced "its Ellen with the police." An unknown individual opened the

door. After seeing seven individuals in the apartment, Officer Rock called for additional assistance. Within two minutes, Officer Hesselbrock and Officer George arrived on the scene. Upon Officer Rock's entry into the apartment he saw, who he later learned to be, Tracy Washington sitting at a table in the kitchen. Upon the arrival of the other officers Mr. Washington made statements to the police to the effect of "you don't have a right to be here", "you can not search me". Additionally, there were various items of drug paraphernalia in plain view in the living room of the apartment.

Officer Rock decided that he wanted to pat down everyone in the apartment to make sure there were no weapons present before he ran their names for outstanding warrants. As Officer Rock approached Washington, the Defendant again stated that he did not have permission to search him. Officer Rock then informed Mr. Washington that he could arrest him for criminal trespass at which point, according to Officer Rock, Mr. Washington stated "I believe I'm dirty." In response to further questions from Officer Rock, Mr. Washington stated that he had a gun. At which point, Officer Rock gained control of Mr. Washington's hands, did a pat down, felt the weapon, handcuffed Mr. Washington and removed the weapon. Mr. Washington was then placed under arrest. During this pat down, Officer Rock also discovered a small crack pipe on his person.[1] Officer Rock advised Washington of his Miranda rights when he took him outside to their vehicle.

---

[1] Officer Hesselbrock testified at the hearing that crack pipes were found on the kitchen table where Tracy Washington was sitting. However, Officer Rock testified at his deposition that a crack pipe was found on Tracy Washington's person and that there was nothing to indicate that Washington was actively engaged in a crime. Based upon the fact that Officer Rock was the only officer performing a search of the apartment and that the Consent to Search Without A Warrant, Government Exhibit 2, lists a crack pipe and a gun as being recovered from Washington, the Court finds that the crack pipe was on the person of Washington and not sitting on the table.

At the time that this was occurring Officer Rock did not know anything about Washington's criminal history, his propensity to carry a firearm or his history, or lack there of, of violence. Additionally, Washington remained seated at the kitchen table and did not do anything with his hands that made Officer Rock think that Washington posed a risk to him. In fact, Officer Rock testified in his deposition that "nothing about his words or actions made me believe he was actively engaged in a crime" aside from his mere presence in the apartment. (Rock Depo., p52).

According to Officer Rock, after he was read his rights, Mr. Washington stated to the police officers that he carried the weapon for protection. A store on Vine Street had been broken into and the owners of the store believed that Mr. Washington was responsible for the break in. The owners had physically assaulted Mr. Washington and he was worried that they would come back to do more harm to him.

Defendant Tracy Washington moves to suppress the gun based upon an invalid consent to search and the statements made thereafter because the statements were made after the arrest but before he received his Miranda warnings . The government counters that the consent was valid and that Mr. Washington had no expectation of privacy in the apartment as he was a trespasser.

I.   ANAYLSIS

    A.   Unlawful Search

It has long been established that the Fourth Amendment generally prohibits the entry into a home, whether to make and arrest or search the premises, without a warrant. However, there are exceptions to this rule, one of which is when voluntary consent has been obtained "from the individual whose property is searched or from a third party who

possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)(internal cites omitted). The determination of the wether or not the third party who consents has common authority over the premises must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises? If not, then warrantless entry without further inquiry is unlawful unless authority actually exists." *Id.* at 188 *quoting Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). *See also United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006)("A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search.")

Officer Rock testified that he "knew from speaking to both Mr. Young and Mr. Moore that no one was permitted to be in the apartment" and that he "believed she had no legal right to be there." Based upon this belief and that Ms. Wilson indicated her address on the consent form as "2584 WW North Blvd/1906 Elm St. #3," Officer Rock should have made further inquiry as to her authority. No further inquiry was made and the government has failed to put forth any evidence that Ms. Wilson had actual authority to consent. Therefore, the consent was not valid.

However, the question still remains whether or not Defendant Washington had a expectation of privacy to be able to assert a Fourth Amendment violation based upon the unlawful entry. "It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." *United States v. Talley*, 275 F.3d

560, 563 (6th Cir. 2001) *citing United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988).

The Sixth Circuit employs a two-part inquiry for determining whether a legitimate expectation of privacy exists in the place searched. "First, we ask whether the individual, by conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private. Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) *quoting United States v. King*, 227 F.3d 732, 743 (6th Cir. 2000)(internal cites omitted).

If Mr. Washington was, in fact, living in Apartment 3 then he would have an expectation of privacy as it would be his home. Additionally, the Supreme Court has held that overnight guest also have a legitimate expectation of privacy. In so holding the Court stated:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the every day expectations of privacy that we all share. Staying overnight in another's home is a long standing social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend . . . .
>
> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend.

*Minnesota v. Carter*, 525 U.S. 83, 89 (1998) *quoting Minnesota v. Olson*, 495 U.S. 91

(1990). However, a mere visitor is not entitled to an expectation of privacy. *Id.*

At the hearing, Defendant proffered an Affidavit signed by him asserting that he was living in Apartment #3 with George Young's knowledge, that he stored and kept personal property, including clothing and personal care items there, and that he had a key. He further asserts that during Young's arrest Young told Washington to lock up the apartment because he did not have his keys and that Young never told Washington that he had to leave the apartment. Obviously, the Government was not able to cross exam this affidavit.

Jeff Moore testified that he had seen Washington in the building and in Apartment #3. He also testified that Washington was the nephew of George Young. However, Mr. Moore further testified that George Young was the only legal tenant of Apartment #3 and that the lease provides for only one person to reside in the unit. He also testified that he never saw Washington carry laundry or food in or out of the apartment.

It is undisputed that Washington was present in the apartment on December 18th, the day of Young's arrest and on December 25th, the day of the search. Officer Rock testified that during Young's arrest he was yelling at Washington to get everyone out of the apartment. The following exchange took place at Officer Rock's deposition:

> Q. Officer, my question was did Mr. Young say directly to Mr. Washington, get out of my apartment or something of that nature?
> A. He said something of that nature.
> Q. Well, did he specifically direct Mr. Washington to depart from Apartment 3?
> A. Yes.
> \*\*\*
> A. Mr. Young told Mr. Washington that he wanted everyone out of his apartment.
> Q. And there was one statement and that was the statement?
> A. It was several statements and I don't recall the exact wording of those statements.

(Rock Depo., p30-31).

Officer Hasselbrock testified that he has had many occasions to know Washington and has arrested him before.  Officer Hasselbrock testified that Washington always gave an address of 926 or 934 Oak Street as his residence.  However, Officer Hasselbrock also testified that although he found clothes in the apartment he can not say who they belonged to and that he did not search for anything owned by Washington.  Officer Hasselbrock also did not ask Washington if he was a resident of the apartment or if he owned anything in the apartment at the time of the arrest.

The burden is on the Defendant to prove he had an expectation of privacy.  Based upon the conflicting evidence the Court can not find that Defendant has met this burden.  Thus, although the initial intrusion onto the premises was invalid, Washington had no expectation of privacy and therefore there can be no Fourth Amendment violation for the unlawful entry.

      B.    Unlawful Arrest

In addition to the protections of the Fourth Amendment against unlawful entry and search of a private place, the Fourth Amendment provides protection against the unlawful arrest and detention of an individual.  Both Fourth Amendment protections are "subject to probable cause justifications by an appropriate judicial officer... ." *United States v. McNeal*, 955 F.2d 1067, 1070 (6th Cir. 1992).  "[A] warrantless arrest must be supported by the existence of probable cause of sufficient weight to support a belief that the individual detained committed a criminal offense.  Thus, the constitutional protection of the Fourth Amendment against a warrantless arrest insures against an unreasonable seizure of an individual's person. *Id.* at 1071.

The Court in *McNeal* stated that "if the appellant had no reasonable expectation of

privacy in Ward's apartment, his only remaining redress was to invoke the distinctively different Fourth Amendment constitutional prohibition against illegal *detention of his person* by proving that his warrantless arrest while on the premises of a third party wherein he had no expectation of privacy was without probable cause of sufficient weight to support a belief that *he had committed a crime* - legality of entry into Ward's apartment notwithstanding." *Id.* (emphasis in original). This same analysis is applicable here.

Since this Court has found that Washington is not entitled to Fourth Amendment Protection against the illegal entry and search of Apartment 3, his encounter with Officer Rock after he entered the apartment "must be judged within the context of a confrontation between citizen and law enforcement authority in a public place." *Id.* at 1076. Thus, probable cause to support the warrantless arrest "must be assessed by evaluating the *totality* of the information available to the officers when they first observed [Washington] *after* entering [Young's] apartment." *Id.* (emphasis in original). The Court in *McNeal* found that "[t]his would include the information supplied to the agents before entering the premises by an informant who had provided reliable information in the past as corroborated by the agent's own initial observation...". *Id.*

In this matter, Jeff Moore had previously informed Officer Rock that there was high traffic coming in and out of Apartment 3 and that he had received complaints from other tenants that individuals had been seen going into Apartment 3 with guns. Mr. Moore had requested that Officer Rock check the building and remove those who did not belong there. Officer Rock did not observe any criminal activity by Washington prior to or after his entry in the apartment "aside from his mere presence in the apartment." The complaints by Mr.

Moore and Officer Rock's general belief that the building is a "hot bed" of illegal activity, combined with the fact that Officer Rock had a reasonable belief that Mr. Washington was committing criminal trespass, is sufficient for probable cause to detain Mr. Washington. Additionally, upon further questioning from Officer Rock, Mr. Washington admitted that he was "dirty" and was carrying a firearm. Thus, the Fourth Amendment's protection against an unlawful arrest and detention was not violated.

  C. Miranda Rights

Washington also argues that his statements must be suppressed as they were made prior to being advised of his Miranda rights. However, no evidence was admitted at the hearing to support this argument. Officer Rock specifically testified that Washington made statements after he was advised of his Miranda rights. Since Defendant was properly given his Miranda warnings his statements are admissible. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Dickerson v. United States*, 530 U.S. 428 (2000).

III. CONCLUSION

Defendant's Motion to Suppress (Doc. 14) is Denied.

**IT IS SO ORDERED**.

              s/Michael R. Barrett
              MICHAEL R. BARRETT, Judge
              United States District Court